UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| LINDA SHAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:21-CV-272-HAB |
| | ) | |
| REGAL-BELOIT AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

*I'd be a fearless leader*
*I'd be an alpha type*
*When everyone believes ya*
*What's that like?*

TAYLOR SWIFT, *The Man*, LOVER (Republic Records 2019)

Plaintiff, a sixty-three-year-old woman, was fired from her position as Vice President and General Manager of Defendant's Heating, Ventilating, and Air-Conditioning ("HVAC") segment. She posits several discriminatory reasons for her termination, including her age, gender, and a prior report of sexual harassment. Not so, Defendant argues. Instead, Defendant claims that Plaintiff was fired because of poor job performance and the elimination of her position. Defendant moved for summary judgment on Plaintiff's claims. (ECF No. 46). That motion is now fully briefed (ECF Nos. 48, 53, 59) and ripe for ruling.

**I.      Factual Background**

Plaintiff was hired in February 2015 into her role as VP and GM of Defendant's HVAC segment. She reported directly to John Kunze ("Kunze"), Defendant's President of Climate Solutions, when she was hired and throughout her employment. Plaintiff's initial role was to lead

all business responsibilities associated with the HVAC business segment. The role evolved, and by the end the segment's sales organization reported directly to Kunze.

**A.**     ***Plaintiff's Alleged Job Performance Issues***

According to Defendant, Kunze began to develop concerns about Plaintiff's job performance in 2017. In July of that year, Kunze received an email from Pat Quilty ("Quilty"), Defendant's VP of Sales – Climate Solutions. That email stated that Plaintiff yelled at and scolded one of Defendant's largest clients, Carrier, during a meeting. Kunze later reached out to a Carrier representative who confirmed Plaintiff's behavior and tone. Plaintiff disputes Quilty's characterization of her conduct. She asserts that she was "representing [Defendant's] interests" after Carrier became "very heavy-handed" during negotiations. (ECF No. 52 at 3). She denies yelling at or scolding anyone from Carrier.

Two days later, Kunze received an email chain between Birch Taylor ("Taylor"), Defendant's Business Leader – Distribution of Climate Solutions, and Plaintiff. It appears that an employee on Taylor's team erroneously priced products to a customer. Plaintiff stated that she "want[ed] to know who authorized" the pricing, that Taylor's team did "not even know how this is priced in the market," and that "this is a mess that needs to get cleaned up." (ECF No. 49-2 at 13). Taylor responded that Plaintiff's email was "emotional and accusatorial," and asked Plaintiff to "re-visit" her involvement in the issue. (*Id.*). Plaintiff replied that her tone was not "emotional," and that by describing her tone as such, Taylor was invoking "stereotypes" where "men are tough and women are emotional." (*Id*. at 12).

In August 2017, Kunze and Plaintiff had an email exchange about Plaintiff's interactions with coworkers. The theme of the exchange is that Kunze had received complaints that Plaintiff was "too abrasive" in her interactions, which was getting "in the way of [her] future success."

(ECF No. 55-20 at 3). Plaintiff disagreed, blaming most of the issues on Quilty's "behavior," and arguing that she was not getting enough credit for HVAC's performance. (*Id*. at 2, 4).

In October 2017, Kunze documented an escalating dispute between Quilty and Plaintiff. The dispute began with a disagreement over which customer service team would assist a customer. It quickly escalated, with Plaintiff walking into Kunze's office and stating that Quilty was "harassing and intimidating her," and specifically that Quilty "shouts over her, won't listen to her, [and] won't acknowledge her opinions." Plaintiff also stated that she was considering leaving the company because of Quilty's behavior. (ECF No. 49-4 at 30). Kunze had an in-person meeting with Quilty and Plaintiff a week after the dispute started. While the meeting was productive at the beginning, it devolved quickly. Plaintiff told Quilty she "didn't want to do his fucking job," and accused Quilty of harassing her because she was a woman. (*Id*.). Quilty denied harassing Plaintiff.

In the email string documenting the dispute, Kunze suggested that Defendant should "take [Plaintiff] up on her offer to leave the company," and suggested two possible male replacements. (*Id*. at 29). Terry Colvin ("Colvin"), Defendant's VP of HR, responded that "based on what I think I know, this would be dangerous." (*Id*.).

In February 2018, Kunze received an email from Michael Wickiser ("Wickiser"), Defendant's Senior VP for Commercial and Industrial Systems. The email related comments from Ripley Ross ("Ross"), Carrier's Sourcing Manager/Director of Motors. Ross reported that Plaintiff was "tremendously argumentative," that Ross felt "bullied," that Plaintiff didn't realize that Carrier was a customer, that Plaintiff was "overly indelicate," and that Plaintiff had "judgment issues." (ECF No. 49-2 at 21). For his part, Wickiser stated he thought Ross' comments were "so right," but added that he appreciated the "value [Plaintiff] brings." (*Id*.).

3

A year later, Kunze was copied on an email exchange between Plaintiff and Mohamad Dahouk ("Dahouk"), Defendant Director – Climate Solutions Technology. Plaintiff complained about a meeting from earlier in the day, stating that there were "a lot of excuses." (*Id*. at 23). Dahouk responded by stating, "we really need to tune our reactions and tone during the meeting," noting that "project leaders are very nervous around the table about what to say and not to say as they are afraid on what comment will blow up in their face." (*Id*.).

Finally, Defendant provides undated recollections from Tammy Randall ("Randall"), another of its VPs of HR. Randall recalls that Oscar Quezada ("Quezada"), a former VP of Operations, felt that Plaintiff was difficult to get along with and that she blamed others for issues that arose. Plaintiff has submitted Quezada's declaration where he confirms that Plaintiff raised her voice in at least one meeting but he attributes her conduct to the "pressure involved in an executive position." (ECF No. 55-25 at 3). Randall also recalls Dahouk referring to Plaintiff as difficult and disrespectful.

**B.     *Allegations of Harassment Against Quilty***

In June 2018, Quilty made what Defendant describes as a "joke" in the presence of Plaintiff and another of Defendant's employees. The joke was more of an extended monologue, with Quilty riffing on how he wanted to be reincarnated as a cow so he could "suck on tits all day." (ECF No. 52 at 7-8).

A few days after Quilty's monologue, Plaintiff made a verbal complaint of harassment to Colvin. Colvin spoke with Quilty, and Quilty confirmed that his statements were inappropriate. Colvin admonished Quilty and told Quilty to apologize to Plaintiff. Quilty did so. There were no additional incidents of harassment by Quilty towards Plaintiff. But the evidence shows that Plaintiff had reported an earlier incident of harassment in August 2017.

**C.**     ***Louis Pinkham Takes Over Defendant, Pushes "Fresh Talent"***

Louis Pinkham ("Pinkham") became CEO of Regal in April 2019. Shortly after assuming the role, Pinkham began a push to improve Regal's performance in the market. His plan was to "partner[] new perspectives and ideas with employees' experience and capabilities." (ECF No. 52 at 11). Pinkham often referred to this as the need for "fresh talent." Regal denies that "fresh talent" has anything to do with age, instead describing it as the need for external hires and moving existing employees between divisions. But Plaintiff claims that Pinkham often talked about bringing in "younger," in addition to fresher, talent.

Plaintiff identifies several incidents where Pinkham emphasized the need for younger, rather than "fresh," talent. She states that Pinkham regularly met with his executive team and told them that they "were all too old." Defendant's Talent Review documents identified "aging workforce" as an employee weakness, and "younger leader" as an employee strength. During Pinkham's opening statement at his first annual sales meeting, Pinkham said, "look at the old white people in this room. We are going to need to get some fresh blood in this business." Pinkham made similar statements at a November 2019 meeting, "joking" that "he needed to get a younger staff." Finally, during subsequent organization reviews, Pinkham made multiple comments opening with when senior directors would retire, and then asking, "can we start getting younger more dynamic leadership in place?" Pinkham's stated goal, according to Plaintiff, was to "drive the average age of the team downwards dramatically." (*Id*. at 11-12).

Part of Pinkham's performance improvement initiative was to decentralize the company, forming four segments of business. In June 2019, each of those segments underwent an organizational realignment. This realignment saw Plaintiff, and "numerous" other employees, reclassified from Level 30 to Level 27. While Defendant states that the reclassification did not

5

affect "anything" related to Plaintiff's job, Plaintiff states that the reclassification "removed [her] ability to sign off on financial items as well as impacting her pay level, stock options, and Individual Compensation Plan." (*Id*. at 13).

Another part of Pinkham's initiative was to stress "succession planning," "a standard part of [Defendant's] talent review process to continually identify and discuss successors for positions that could potentially fill roles should they become available." (*Id*. at 19). Defendant describes succession planning as a necessary part of its long-term plan, useful for filling vacancies when they arose, and states that age played no part in that planning. Plaintiff rejects the age-neutral claim, pointing to Pinkham's age-related statements.

**D.**   *Plaintiff Receives a Series of Middling Performance Reviews*

Kunze was responsible for completing Plaintiff's performance reviews in 2018, 2019, and 2020.[1] Supervisors ranked employees on three subjects: performance, behavior, and final. In each subject, employees could be rated as: (1) shining, (2) developing, (3) striving, and (4) needs improvement.

In 2018, Kunze rated Plaintiff's performance as shining, her behavior as developing, and her final as striving. Kunze stated in the review that it was key for Plaintiff to "foster positive relationships and communications inside Regal and outside Regal." (*Id*. at 23). Plaintiff was not rated as a "rising talent" but, as Plaintiff points out, that rating did not apply to her given her disinterest in further promotion.

In 2019, Kunze rated Plaintiff's performance as striving, her behavior as developing, and her final as striving. The evaluation stated that Plaintiff "really needs to better balance edge in

---

[1] There appears to be some dispute over the timeframes covered by each review. Plaintiff repeatedly disputes Defendant's claims that reviews are for the prior year's performance; for example, that the 2018 performance review was based on job performance in 2017. (*Id*. at 23). But Plaintiff offers no other explanation for how the reviews worked and, in any event, it doesn't seem to matter.

dealings with the team." (*Id*. at 24). Plaintiff acknowledged the "edge" comment. That said, she attributes the problem to a lack of responsiveness and accountability by Defendant's sales staff. Plaintiff was again not rated as a rising talent.

In 2020, Kunze rated Plaintiff's performance as striving, her behavior as needs improvement, and her final as needs improvement. For her part, Plaintiff admitted in the performance review that she needed to "communicate more clearly with leadership, work on style and presentation," but noted that her asthma impeded her communication. (*Id*. at 25). Kunze rated Plaintiff as "properly placed" in terms of potential and identified two people, a man and a woman, as potential replacements for purposes of succession planning.

**E.**   ***Plaintiff Gets Put on a PIP***

In January 2020, Plaintiff got into a verbal disagreement with Arlene Campbell ("Campbell"), Defendant's VP of Sales. Defendant describes Plaintiff as "yelling" during the disagreement, a charge Plaintiff denies. Campbell was not without fault, with Randall's notes of the incident describing Campbell as "a little cavalier," and that she needed to "listen more" and have more "self-awareness." According to Randall's notes, Plaintiff stated she "cannot deal" with Campbell, that Campbell "lies about everything," and Plaintiff then detailed shortcomings in the sales department.

Because of what Defendant viewed as a history of "inappropriate behavior with internal and external individuals," Kunze put Plaintiff on a Performance Improvement Plan ("PIP"). (*Id*. at 27). Kunze discussed with Plaintiff why she was being placed on a PIP, most of those reasons relating to her interactions with others. Plaintiff was provided an example for each reason, although she disputes the legitimacy of the examples. The PIP listed several objectives and goals for Plaintiff to complete, again most relating to her interactions with others.

Part of the PIP was weekly meetings between Plaintiff, Kunze, and Randall. During one of those meeting, succession planning came up. Kunze suggested hiring someone "younger" to assist Plaintiff and others in the Climate segment. Nothing in the record suggests that anyone "younger" was ever hired to assist Plaintiff.

Also part of the PIP was business coaching for Plaintiff, provided by Patricia Clason ("Clason"). Clason's notes of her coaching sessions with Plaintiff have no reference to complaints of age or gender discrimination or retaliation. Clason did tell Plaintiff to document her concerns, but there is no evidence that Plaintiff documented any instances of discrimination or retaliation.

Plaintiff completed the PIP in March 2020.

### F.    *Plaintiff is Terminated*

Beginning in May 2020, Defendant began a reduction in force ("RIF") to reduce costs, a move required by business losses the pandemic caused. The RIF included combining the HVAC and Combustion segments into one. This meant that either Plaintiff, VP and GM of HVAC, or Stu Gatley ("Gatley"), VP and GM of Combustion, would lead the combined segment while the other's position would be eliminated. Kunze was tasked with making the decision.

Defendant claims that, after evaluating the candidates "strengths and weaknesses," Kunze decided that "Gatley held more qualities relevant to the VP/GM of HVAC and Combustion position and on that basis selected him for that position." (*Id*. at 34). It also claims that "neither age, gender, nor [Plaintiff's] complaint against Quilty played any role in Kunze's decision." (*Id*.). Defendant also denies that the PIP or Plaintiff's performance evaluations were the reason for her firing. Because Gatley was selected, Plaintiff was terminated effective June 26, 2020.

Plaintiff disputes the idea that the RIF had anything to do with her termination. She cites three documents in support of her position. First is an email from Kunze to Randall in May 2020.

The email identifies two male candidates to replace Plaintiff and two other individuals. The email also identifies Plaintiff as a "retirement candidate[]." (ECF No. 55-13 at 2). The second is an organizational chart, also from May 2020. On a slide titled "Current Climate Staff," Plaintiff is listed but under her picture is the note "Retirement/Role Change." (ECF No. 55-14 at 3). Plaintiff is omitted from the next slide, titled "Future Climate Staff." (*Id*. at 4). The last document is an email chain between Kunze, Randall, and Pinkham. In that chain, Pinkham suggests an external candidate to replace Plaintiff. (ECF No. 55-30 at 3). Kunze confirms that Defendant needs "new talent," as his team is "very mature and needs an infusion in the next generation of leaders." (*Id*. at 2).

**G.**     ***Plaintiff's Request to Accelerate the Vesting of her Retirement is Rejected***

When employees retire, they can ask Defendant to accelerate the vesting of stock options that have not yet vested at retirement. Employees must meet requirements for vesting, including: they must be at least 58 years old, have been employed by Defendant for at least 10 years, and have met performance expectations for the year they seek to accelerate. Acceleration is not guaranteed even if all requirements are met.

In January 2020, Defendant determined that Plaintiff met the eligibility requirements for acceleration. But Plaintiff never requested acceleration while still employed by Defendant. Instead, she requested acceleration three days after she was fired. Defendant asserts that Plaintiff was no longer eligible for acceleration after her termination.

## II.     Legal Discussion

### A.     *Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

**B.**      ***Plaintiff has Shown a Genuine Dispute of Material Fact on her Title VII Discrimination Claim***

Plaintiff's first claim is one for gender discrimination under Title VII. Gender discrimination claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies created by *McDonnell Douglas. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Smith v. Chicago Transit Auth.,* 806 F.3d 900, 905 (7th Cir. 2015) (noting the *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence – evidence that similarly situated employees not in the plaintiff's protected class were treated better – would permit a jury to infer discriminatory intent."). Still, in all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (instructing courts to stop separating "direct" from "indirect" evidence and instructing, instead, that the test is "simply whether the evidence would permit a reasonable factfinder to conclude the plaintiff's [protected status] caused the discharge or other adverse employment action). *Liu v. Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination.").

Under the burden shifting method, Plaintiff must first establish several prima facie elements of discrimination. To successfully set forth a prima facie case of sex discrimination, Plaintiff must show that: 1) she is a member of a protected class; 2) she was meeting her employer's legitimate performance expectations; 3) she suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000).

11

If Plaintiff establishes a prima facie case, the burden of production shifts to Defendant to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id*. If Defendant carries this burden, Plaintiff must show that Defendant's purported reasons are a pretext for discrimination or that the decision was tainted by impermissible, gender-based motives. *Id*. at 143. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

**1.**     *What are the Actionable Adverse Employment Actions?*

In applying *McDonald Douglas*, a dispute exists as to which of Plaintiff's complaints are actionable adverse employment actions. The Seventh Circuit has described an adverse employment action as "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Stockett v. Muncie Ind. Transit Sys*., 221 F.3d 997, 1001 (7th Cir. 2000) (alteration in original) (internal quotation marks omitted). Such actions include: (1) diminishing an "employee's compensation, fringe benefits, or other financial terms of employment," including termination; (2) reducing long-term career prospects "by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted"; and (3) changing "the *conditions* in which [an employee] works . . . in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." *Herrnreiter v. Chicago Hous. Auth*., 315 F.3d 742, 744 (7th Cir. 2002) (emphasis in original).

Plaintiff identifies four potential adverse employment actions: (1) her reclassification from Level 30 to Level 27; (2) placement on the PIP; (3) her termination; and (4) denial of acceleration

of Plaintiff's retirement benefits. The Court finds that the first two fail to meet the Seventh Circuit's standard.

The primary dispute is over the reclassification. While Defendant states that the reclassification did not affect "anything" related to Plaintiff's job, Plaintiff states that the reclassification "removed [her] ability to sign off on financial items as well as impacting her pay level, stock options, and Individual Compensation Plan." (ECF No. 52 at 13). The Court discounts Plaintiff's reference to "pay level, stock options, and Individual Compensation Plan" because there is no evidence any of that was "diminished" as required by Seventh Circuit law. Plaintiff states only that those were "impacted," but doesn't say how. Nor does she provide a pay stub, retirement plan statement, or any other evidence that would show a diminishment in some financial benefit of her employment. The Court finds that Plaintiff has failed to rebut, via evidence, Defendant's claim that the financial aspects of her job were unchanged.

The issue, then, is whether removing her ability to sign off on financial items rendered the reclassification an actionable employment action. Plaintiff cites *Williams v. Lovchik*, 830 F. Supp. 2d 604 (S.D. Ind. 2011), where Judge Walton Pratt observed that "an adverse employment action can occur when an employee's new position is considered less important within the organization, where it requires less skill or brainpower, or where it results in a significant reduction in responsibilities." *Id*. at 621. All true, but the Court cannot conclude that removing Plaintiff's ability to sign off on financial items was a "significant reduction in responsibilities" for a corporate Vice President overseeing an entire business segment.

The undisputed evidence shows that the change in Plaintiff's role was one of nomenclature rather than pay or responsibility. Yes, she was reclassified from a Level 30 to a Level 27, just like many other Level 30 employees. But if her pay didn't decrease (and there's no evidence it did)

and if her responsibilities didn't change (and there's evidence of only a single, insignificant change), then there's no actionable adverse employment action. That's the case here; the reclassification is not actionable.

Much the same can be said of the PIP. While a PIP can be evidence of discrimination, it is an adverse employment action only where it has "materially adverse" consequences, such as a decrease in compensation. *Bagwe v. Sedgwick Claims Mgmt Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016). There is no evidence of materially adverse consequences arising from the PIP. Plaintiff states only that the PIP "set the stage for her termination," (ECF No. 53 at 13), but there's no evidence of that. Instead, Defendant steadfastly maintains that Plaintiff's performance evaluations played no role in its termination decision. Defendant's position will have consequences later, but nothing in the record suggests that the PIP, rather than the stated reasons for the PIP, played any role in Defendant's hiring or firing decisions. Without that connection, the Court cannot say that the PIP is actionable.

**2.**    *Plaintiff has Failed to Show Pretext Related to her Retirement Benefits*

On to the actionable claims. Because none of the other elements of the prima facie case are disputed by Defendant, the Court will proceed to pretext. Pretext means "a fabrication, designed to conceal an unlawful reason"; it is "something worse than a business error," where "deceit [is] used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000) (citation omitted). To demonstrate pretext, a plaintiff can present evidence that: (1) the defendant was "more likely than not motivated by a discriminatory reason"; or (2) the defendant's stated reason is not credible. *Alexander v. Wisconsin Dep't of Health & Fam. Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). When considering pretext at the summary judgment stage, "the only question before [the Court] is whether the plaintiff has provided evidence from which a rational trier of fact

14

could infer that the employer's stated reasons for taking the adverse action were lies." *Alexander*, 263 F.3d at 683. "In determining whether the employer's reason can be characterized as pretextual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020).

Defendant claims that it refused Plaintiff's request to retire and accelerate certain retirement benefits for a straightforward reason: she had already been fired. So, Defendant claims, Plaintiff was no longer eligible for retirement, much less acceleration of retirement benefits.

Plaintiff seeks to show that this reason was pretext by arguing that she was the only one that had their retirement requests denied. Her deposition lists several potential comparators (*see* ECF No. 53 at 14-15), and she points to an email discussing another employee's request as another comparator. (*See* ECF No. 55-34). The problem for Plaintiff is there is no evidence that any of these individuals were terminated before making their retirement requests. The Court has no information about the individuals she mentions in her deposition. The identified email is so full of corporate speak and acronyms that the Court can make little sense of it. But there is some suggestion that the email employee, "Vivek," was "given the opportunity to retire," suggesting that he hadn't been terminated first. (*Id*. at 3). That's simply not the case with Plaintiff.

The thrust of Plaintiff's argument seems to be her belief that she should have been able to elect to retire rather than being terminated. But that's not what happened, and there's even evidence to suggest that she refused such an opportunity. (ECF No. 49-1 at 42). With no evidence that Defendant allowed any other terminated employee to retire or to accelerate retirement benefits, the Court cannot find that Defendant's common-sense explanation was pretext.

**3.**     *Plaintiff has Shown Pretext Related to her Termination*

Plaintiff's termination is a different story. Defendant's argument is, essentially, Plaintiff was fired because she wasn't selected for the new position of VP/GM or HVAC and Combustion. Her termination, then, was the natural result of the RIF and nothing else.

The problem, at least for summary judgment, is that Plaintiff has submitted evidence that Defendant was well on its way to firing Plaintiff before discussion of the RIF even started. This includes emails between Pinkham, Kunze, and Campbell in February 2020 (ECF No. 55-30), emails between Kunze and Campbell from May 2020 (ECF No. 55-13), and an organizational chart from May 2020 (ECF No. 55-14), all planning to replace Plaintiff. These documents all make the RIF look more like a convenient excuse to fire Plaintiff rather than an honestly held reason.

The Court stresses that Plaintiff's Title VII discrimination claim is extremely thin. There isn't much to suggest that Plaintiff was fired because she was a woman. But there is evidence that suggests Defendant's stated reason for the termination was a lie. And Plaintiff lost out on that job to a man, with nothing more offered to explain the hiring decision than that the man "held more qualities relevant" to the position. Was one of those qualities a Y chromosome? That's an issue for a jury to decide.

**C.**     ***Plaintiff has Failed to Show a Genuine Issue of Material Fact on her Title VII Retaliation Claim***

Plaintiff also brings a claim for retaliation under Title VII. She asserts that her termination was caused by her complaints about Quilty's behavior. In pursuing such a claim, "plaintiffs must offer evidence of three elements: (1) they engaged in protected activity, (2) they suffered adverse employment actions, and (3) there was a causal connection between the protected activity and the adverse employment actions." *Castro v. DeVry Univ., Inc*., 786 F.3d 559, 564 (7th Cir. 2015). The same burden-shifting under *McDonnell Douglas* that applies to the discrimination case also applies

to Plaintiff's retaliation claim. *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000).

Where Plaintiff's case fails is on causation. As Defendant notes, Plaintiff argues her causation case under an outdated "not wholly unrelated" standard. (ECF No. 53 at 18). The modern standard is "but-for" causation; that is, that the termination[2] would not have occurred without Plaintiff's protected activity. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). A plaintiff may prove but-for causation through direct evidence, "which would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')" or, more commonly, through circumstantial evidence presenting a "convincing mosaic" that would permit the same inference without the employer's admission. *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) Evidence common to establish a "convincing mosaic" includes "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643-44 (7th Cir. 2013). The Court must consider the individual "bits and pieces" of evidence Plaintiff offers in support of her evidentiary mosaic in context and collectively. *Id.* at 644.

The Court has already found evidence that Defendant's reason for Plaintiff's termination could be pretext. But the Court finds nothing else that points to her complaints about Quilty as the cause of her termination. After all, the complaints about Quilty were two years old when Plaintiff was terminated. That's simply too remote to be probative of retaliation. *Castro*, 786 F.3d at 565

---

[2] The Court incorporates the discussion from Section II.B.1. above here and throughout the rest of the opinion. Plaintiff's only actionable adverse employment action is her termination for the reasons stated in that section.

(noting that an "interval of a few weeks or even months may provide probative evidence of the required causal nexus"). And while Plaintiff tries to draw a through-line from her complaints to the termination, alleging that the complaints led to the PIP which led to the termination, there is undisputed evidence that Plaintiff's performance reviews and the PIP were supported by complaints from multiple parties, both within and outside Defendant. The Court understands that Plaintiff disagrees with those complaints, but that's neither here nor there. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008) (job performance must be evaluated "through the eyes of her supervisors at the time" of the adverse employment action). The evidence shows that Defendant believed that Plaintiff had an issue with inter-personal relationships, and that its belief was independent of her complaints about Quilty.

Defendant's suspicious reason for firing Plaintiff has consequences throughout this opinion. But it does not, by itself, demonstrate that Plaintiff's complaints about Quilty, two years removed, were the "but-for" reason she was fired. Plaintiff has failed to make the required causation showing, and Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

**D.     *Plaintiff has Shown Genuine Issues of Material Fact on her ADEA Claim***

The ADEA makes it unlawful for employers to take adverse employment actions against employees who are 40 years old or older because of their age. 29 U.S.C. §§ 623(a), 631(a). Liability in a disparate treatment case "depends on whether the protected trait (under the ADEA, age) *actually motivated* the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (emphasis added). Thus, to prevail on a disparate treatment claim under the ADEA, a plaintiff must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

In *Ortiz*, the Seventh Circuit clarified that the proper way to assess a disparate treatment claim at the summary judgment stage is to ask whether the admissible evidence, considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." 834 F.3d at 765. The familiar *McDonnell Douglas* burden-shifting framework remains a valid method of organizing and assessing circumstantial evidence of employment discrimination. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). To make out a prima facie case of discrimination under the *McDonnell Douglas* framework, Plaintiff must offer evidence that (1) she is a member of a protected class, (2) she was meeting the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside her protected class were treated more favorably (or, in an age discrimination case, that she was replaced by someone substantially younger). *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Then, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its actions. *Carson v. Lake County*, 865 F.3d 526, 533 (7th Cir. 2017). If the employer provides such an explanation, the burden shifts back to the plaintiff to submit evidence that the explanation is pretextual. *Id*. No matter if the plaintiff chooses to proceed under the *McDonnell Douglas* method of proof, "at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age." *Id*.

Before getting to the merits of Plaintiff's disparate treatment claim, first a word about labels. Plaintiff and Defendant both discuss "direct" and "indirect" evidence of discrimination in their briefs. Following *Ortiz*, evidence can no longer "be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently. Instead, all evidence belongs in a single pile that must

19

be evaluated as a whole." *Ortiz*, 834 F.3d at 766. So the Court will evaluate Plaintiff's offered evidence without respect to label.

The Court finds more than enough evidence to send Plaintiff's ADEA case to a jury. Plaintiff has pointed to regular, consistent statements by Pinkham, both overt and thinly veiled, that Defendant needed to hire "younger" individuals. And while Defendant tries to distance Pinkham from the decision related to Plaintiff's employment, there is no question that the executives beneath Pinkham were always mindful of his edicts. Indeed, Kunze, in discussing potential, younger replacements for Plaintiff and others, wrote, "this is what [Pinkham] was talking about." (ECF No. 55-13 at 2). At the very least, the evidence shows that Pinkham's stated preference for a younger workforce held sway among his subordinates.

But Pinkham's statements are not the only evidence of age discrimination. Defendant's Talent Review documents identified "aging workforce" as an employee weakness, and "younger leader" as an employee strength. Kunze specifically discussed hiring a "younger" individual to "assist" Plaintiff. And the documents designated by Plaintiff show an almost myopic focus on moving on retirement-age employees for younger replacements.

When the Court combines the evidence of a preference for younger employees with the evidence that Defendant's stated reason for firing Plaintiff was pretextual, it has little trouble concluding that summary judgment is inappropriate. A jury may ultimately credit Defendant's version of events, but the Court cannot say, as a matter of law, that no age discrimination occurred. Plaintiff's ADEA claim related to her termination must be permitted to go to trial.

## III.   Conclusion

For these reasons, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment (ECF No. 46). The motion is DENIED with respect to Plaintiff's claims under

Title VII and the ADEA as to her termination ONLY. The motion is GRANTED in all other respects.

SO ORDERED on February 5, 2024.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

21